**CLYDE & CO US LLP**
340 Mt. Kemble Avenue, Suite 300
Morristown, New Jersey 07960
Daren McNally
Marianne May
T (973) 210-6700
F (972) 210-6701
Daren.mcnally@clydeco.us
Marianne.may@clydeco.us
Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| CENTURY INDEMNITY CO., AS SUCCESSOR TO CCI INSURANCE CO., AS SUCCESSOR TO INSURANCE CO. OF NORTH AMERICA<br><br>*Plaintiff,*<br><br>v.<br><br>THE DIOCESE OF TRENTON; ALL SAINTS CHURCH; CHRIST THE KING PARISH F/K/A HOLY TRINITY PARISH; CORPUS CHRISTI ROMAN CATHOLIC CHURCH; HOLY CROSS HIGH SCHOOL, DELRAN TOWNSHIP, N.J. A/K/A HOLY CROSS HIGH SCHOOL A/K/A HOLY CROSS ACADEMY; HOLY CROSS PARISH; HOLY CROSS CHURCH; HOLY CROSS ELEMENTARY SCHOOL; HOLY TRINITY CHURCH; CHURCH OF INCARNATION D/B/A INCARNATION-ST. JAMES CHURCH; MARY MOTHER OF GOD; OUR LADY OF MOUNT CARMEL PARISH; OUR LADY OF MOUNT CARMEL CHURCH; OUR LADY OF MOUNT CARMEL ELEMENTARY SCHOOL; THE PARISH OF OUR LADY OF SORROWS – ST. ANTHONY; SACRED HEART PARISH; SACRED HEART SCHOOL; ST. AMBROSE PARISH; ST. AMBROSE CHURCH; ST. ANN ROMAN CATHOLIC CHURCH A/K/A CHURCH OF ST. ANN; THE CHURCH OF ST. ANN; ST. ANTHONY PARISH; ST. ANTHONY CHURCH; ST. ANTHONY ELEMENTARY SCHOOL; ST. ANTHONY OF PADUA PARISH; ST. JOAN OF ARC PARISH; ST. JOAN OF ARC CHURCH; ST. | Civil Action No. 3:24-cv-685<br><br>**COMPLAINT &**<br>**JURY DEMAND** |

JOAN OF ARC SCHOOL; ST. JOSEPH'S PARISH; ST. JOSEPH'S CHURCH; ST. JOSEPH'S ELEMENTARY SCHOOL; ST. JOSEPH ROMAN CATHOLIC CHURCH; ST. JOSEPH GRADE SCHOOL; ST. KATHARINE DREXEL PARISH; ST. MARY A/K/A ST. MARY'S; ST. RAPHAEL – HOLY ANGELS PARISH; ST. ROSE PARISH; ST. ROSE CHURCH; ST. ROSE HIGH SCHOOL; ST. THOMAS' THE APOSTLE A/K/A ST. THOMAS THE APOSTLE; ST. MARY OF THE LAKE ROMAN CATHOLIC CHURCH

*Defendants*.

Plaintiff Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America ("Century") alleges as follows:[1]

## NATURE OF THE ACTION

1.    The New Jersey Child Victims Act ("CVA") opened a "revival window" for survivors of child sexual abuse to file otherwise time-barred claims.  The Diocese of Trenton, together with affiliated parishes and schools under the Diocese's control (collectively, the "Diocese"), has been sued under the CVA by hundreds of survivors of child sexual abuse (the "Underlying Claims").

2.    Century issued a series of insurance policies to the Diocese from 1957 through 1972.  The relevant policies cover certain accidents and occurrences, and do not cover liability for accidents and occurrences that the insured expected or intended.

3.    Century has been defending both the Diocese and its affiliated parishes and schools, under a full reservation of rights, in connection with CVA Claims that allege bodily injury during one or more of Century's primary policy periods at issue.

---

[1]    Century alleges on personal knowledge as to allegations about itself.  As to allegations about any other parties, Century alleges on information and belief.

4.      In evaluating the Diocese's claims for coverage for the Underlying Claims, Century has requested information from the Diocese.  To date, the Diocese has not provided all of the information requested, and Century lacks information necessary for its analysis of the Diocese's requests for coverage.  Based on the limited information available to it, Century has been unable to determine whether any of the Underlying Claims arise from covered accidents and/or whether the Diocese failed to comply with the terms of the relevant policies.  To resolve these issues, Century seeks additional information through this declaratory judgment action.

5.      As to relief, Century (i) seeks a declaration that it has no obligation to indemnify the Diocese and/or any individual parishes or schools in connection with any Underlying Claims to the extent that any of the Underlying Claims do not arise from accidents or occurrences as required by the policies and/or the Diocese failed to comply with the terms of the relevant policies, (ii) seeks a declaration that it has no obligation to indemnify the Diocese and/or any individual parishes or schools for bodily injury that occurred outside the time period covered by Century's policies, and (iii) seeks a declaration as to the number of occurrences, if any, associated with each Underlying Claim.

## THE PARTIES

6.      Plaintiff Century is a corporation organized under the laws of Pennsylvania with its principal place of business in Philadelphia, Pennsylvania, and is licensed to operate in the State of New Jersey.  Century issued insurance policies to the Diocese covering periods from January 1, 1957 until January 1, 1972, under which the Diocese now seeks coverage for lawsuits alleging sexual abuse of minors.

7.      Defendant The Diocese of Trenton was established in 1881 by the Holy See of the Roman Catholic Church to serve Catholics in southern New Jersey.  During the period from 1957 to 1972, when the Diocese was covered by Century's policies, the Diocese comprised eight

counties—Burlington, Mercer, Monmouth, Ocean, Middlesex, Somerset, Hunterdon, and Warren. At that time, the Diocese operated and controlled more than a hundred incorporated parishes and schools.

8.     Today, the Diocese comprises four counties—Burlington, Mercer, Monmouth, and Ocean.  The Diocese operates and controls 97 incorporated parishes, 25 elementary schools, and 5 high schools.

9.     The Diocese was and is a religious not-for-profit corporation and Catholic diocese duly organized and existing under the laws of the State of New Jersey, with a principal place of business for the transaction of religious business at 701 Lawrenceville Road, Lawrenceville Township, New Jersey 08648.

10.     The defendants named in paragraphs 11 to 51 (below) are Diocese-affiliated parishes and schools.  All claim to be insureds under the Century Insurance Policies defined in paragraph 11 (below).

11.     All Saints Church was and is a religious not-for-profit corporation and Catholic church duly organized and existing under the laws of the State of New Jersey, with a principal place of business for the transaction of religious business at 502 High Street, Burlington, New Jersey 08016.  All Saints Church includes, but is not limited to, All Saints Church and any other organizations and/or entities operating under the same or similar name with the same or similar principal place of business.

12.     Christ the King Parish f/k/a Holy Trinity Parish was and is a religious not-for-profit corporation and Catholic parish duly organized and existing under the laws of the State of New Jersey, with a principal place of business for the transaction of religious business at 380 Division Street, Long Branch, New Jersey 07740.  Christ the King Parish f/k/a Holy Trinity Parish includes,

but is not limited to, Christ the King Parish f/k/a Holy Trinity Parish, and any other organizations and/or entities operating under the same or similar name with the same or similar principal place of business.

13.     Corpus Christi Roman Catholic Church was and is a religious not-for-profit corporation and Catholic church duly organized and existing under the laws of the State of New Jersey, with a principal place of business for the transaction of religious business at 110 James Street South River, New Jersey 08882.  Corpus Christi Roman Catholic Church includes, but is not limited to, Corpus Christi Roman Catholic Church and any other organizations and/or entities operating under the same or similar name with the same or similar principal place of business.

14.     Holy Cross High School Delran Township, N.J. a/k/a Holy Cross High School a/k/a Holy Cross Academy was and is a religious not-for-profit corporation and Catholic parochial school duly organized and existing under the laws of the State of New Jersey, with a principal place of business for the transaction of religious business at 50355 Route 130 South, Delran, New Jersey 08075.  Holy Cross High School Delran Township, N.J. a/k/a Holy Cross High School a/k/a Holy Cross Academy includes, but is not limited to, Holy Cross High School Delran Township, N.J. a/k/a Holy Cross High School a/k/a Holy Cross Academy and any other organizations and/or entities operating under the same or similar name with the same or similar principal place of business.

15.     Holy Cross Parish was and is a religious not-for-profit corporation and Catholic parish duly organized and existing under the laws of the State of New Jersey, with a principal place of business for the transaction of religious business at 30 Ward Avenue, Rumson, New Jersey 07760.  Holy Cross Parish includes, but is not limited to, Holy Cross Parish and any other organizations and/or entities operating under the same or similar name with the same or similar

principal place of business.

16.     Holy Cross Church was and is a religious not-for-profit corporation and Catholic church duly organized and existing under the laws of the State of New Jersey, with a principal place of business for the transaction of religious business at 30 Ward Avenue, Rumson, New Jersey 07760.  Holy Cross Church includes, but is not limited to, Holy Cross Church and any other organizations and/or entities operating under the same or similar name with the same or similar principal place of business.

17.     Holy Cross Elementary School was and is a religious not-for-profit corporation and Catholic parochial school duly organized and existing under the laws of the State of New Jersey, with a principal place of business for the transaction of religious business at 30 Ward Avenue, Rumson, New Jersey 07760.  Holy Cross Elementary School includes, but is not limited to, Holy Cross Elementary School and any other organizations and/or entities operating under the same or similar name with the same or similar principal place of business.

18.     Holy Trinity Church was and is a religious not-for-profit corporation and Catholic church duly organized and existing under the laws of the State of New Jersey, with a principal place of business for the transaction of religious business at 408 Prospect St., Long Branch, New Jersey 07740.  Holy Trinity Church includes, but is not limited to, Holy Trinity Church and any other organizations and/or entities operating under the same or similar name with the same or similar principal place of business.

19.     Church of Incarnation d/b/a Incarnation-St. James Church was and is a religious not-for-profit corporation and Catholic church duly organized and existing under the laws of the State of New Jersey, with a principal place of business for the transaction of religious business at 1545 Pennington Road, Ewing Township, New Jersey 08618.  Church of Incarnation d/b/a

Incarnation-St. James Church includes, but is not limited to, Church of Incarnation d/b/a Incarnation-St. James Church and any other organizations and/or entities operating under the same or similar name with the same or similar principal place of business.

20.    Mary Mother of God was and is a religious not-for-profit corporation and Catholic organization duly organized and existing under the laws of the State of New Jersey, with a principal place of business for the transaction of religious business at P.O. Box 56 Flagtown, New Jersey 08821 and 157 South Triangle Road, Hillsborough, New Jersey 08844.  Mary Mother of God includes, but is not limited to, Mary Mother of God and any other organizations and/or entities operating under the same or similar name with the same or similar principal place of business.

21.    Our Lady of Mount Carmel Parish was and is a religious not-for-profit corporation and Catholic parish and duly organized and existing under the laws of the State of New Jersey, with a principal place of business for the transaction of religious business at 75 Morris Street, New Brunswick, New Jersey 08901.  Our Lady of Mount Carmel Parish includes, but is not limited to, Our Lady of Mount Carmel Parish and any other organizations and/or entities operating under the same or similar name with the same or similar principal place of business.

22.    Our Lady of Mount Carmel Church was and is a religious not-for-profit corporation and Catholic church duly organized and existing under the laws of the State of New Jersey, with a principal place of business for the transaction of religious business at 75 Morris Street, New Brunswick, New Jersey 08901.  Our Lady of Mount Carmel Church includes, but is not limited to, Our Lady of Mount Carmel Church and any other organizations and/or entities operating under the same or similar name with the same or similar principal place of business.

23.    Our Lady of Mount Carmel Elementary School was and is a religious not-for-profit corporation and Catholic parochial elementary school and duly organized and existing under the

laws of the State of New Jersey, with a principal place of business for the transaction of religious business at 75 Morris Street, New Brunswick, New Jersey 08901.  Our Lady of Mount Carmel Elementary School includes, but is not limited to, Our Lady of Mount Carmel Elementary School and any other organizations and/or entities operating under the same or similar name with the same or similar principal place of business.

24.    The Parish of Our Lady of Sorrows – St. Anthony was and is a religious not-for-profit corporation and Catholic parish duly organized and existing under the laws of the State of New Jersey, with a principal place of business for the transaction of religious business at 381 East State Street, Ext., Hamilton, New Jersey 08619.  The Parish of Our Lady of Sorrows – St. Anthony, includes, but is not limited to, the Parish of Our Lady of Sorrows – St. Anthony and any other organizations and/or entities operating under the same or similar name with the same or similar principal place of business.

25.    Sacred Heart Parish was and is a religious not-for-profit corporation and Catholic parish duly organized and existing under the laws of the State of New Jersey, with a principal place of business for the transaction of religious business at 343 South Broad Street, Trenton, New Jersey 08608.  Sacred Heart Parish includes, but is not limited to, Sacred Heart Parish and any other organizations and/or entities operating under the same or similar name with the same or similar principal place of business.

26.    Sacred Heart School was and is a religious not-for-profit corporation and Catholic parochial school duly organized and existing under the laws of the State of New Jersey, with a principal place of business for the transaction of religious business at 250 High Street, Mount Holly, New Jersey 08060.  Sacred Heart School includes, but is not limited to, Sacred Heart School and any other organizations and/or entities operating under the same or similar name with the same

or similar principal place of business.

27.     St. Ambrose Parish was and is a religious not-for-profit corporation and Catholic parish duly organized and existing under the laws of the State of New Jersey, with a principal place of business for the transaction of religious business at 83 Throckmorton Lane, Old Bridge, New Jersey 08857. St. Ambrose Parish includes, but is not limited to, St. Ambrose Parish and any other organizations and/or entities operating under the same or similar name with the same or similar principal place of business.

28.     St. Ambrose Church was and is a religious not-for-profit corporation and Catholic church duly organized and existing under the laws of the State of New Jersey, with a principal place of business for the transaction of religious business at 83 Throckmorton Lane, Old Bridge, New Jersey 08857. St. Ambrose Church includes, but is not limited to, St. Ambrose Church and any other organizations and/or entities operating under the same or similar name with the same or similar principal place of business.

29.     St. Ann Roman Catholic Church a/k/a Church of St. Ann was and is a religious not-for-profit corporation and Catholic church duly organized and existing under the laws of the State of New Jersey, with a principal place of business for the transaction of religious business at 311 Carr Avenue, Keansburg, New Jersey 07734. St. Ann Roman Catholic Church a/k/a Church of St. Ann includes, but is not limited to, St. Ann Roman Catholic Church a/k/a Church of St. Ann and any other organizations and/or entities operating under the same or similar name with the same or similar principal place of business.

30.     The Church of St. Ann was and is a religious not-for-profit corporation and Catholic church duly organized and existing under the laws of the State of New Jersey, with a principal place of business for the transaction of religious business at 1253 Lawrenceville Rr., Lawrence

Township, New Jersey 08648.  The Church of St. Ann includes, but is not limited to, the Church of St. Ann and any other organizations and/or entities operating under the same or similar name with the same or similar principal place of business.

31.     St. Anthony Parish was and is a religious not-for-profit corporation and Catholic parish duly organized and existing under the laws of the State of New Jersey, with a principal place of business for the transaction of religious business at 626 South Olden Avenue, Trenton, New Jersey 08629.  St. Anthony Parish includes, but is not limited to, St. Anthony Parish and any other organizations and/or entities operating under the same or similar name with the same or similar principal place of business.

32.     St. Anthony Church was and is a religious not-for-profit corporation and Catholic church duly organized and existing under the laws of the State of New Jersey, with a principal place of business for the transaction of religious business at 626 South Olden Avenue, Trenton, New Jersey 08629.  St. Anthony Church includes, but is not limited to, St. Anthony Church and any other organizations and/or entities operating under the same or similar name with the same or similar principal place of business.

33.     St. Anthony Elementary School was and is a religious not-for-profit corporation and Catholic parochial school duly organized and existing under the laws of the State of New Jersey, with a principal place of business for the transaction of religious business at 626 South Olden Avenue, Trenton, New Jersey 08629.

34.     St. Anthony of Padua Parish was and is a religious not-for-profit corporation and Catholic parish duly organized and existing under the laws of the State of New Jersey, with a principal place of business for the transaction of religious business at 436 Port Reading Avenue, Port Reading, New Jersey 07064.  St. Anthony of Padua Parish includes, but is not limited to, St.

10

Anthony of Padua Parish and any other organizations and/or entities operating under the same or similar name with the same or similar principal place of business.

35.     St. Joan of Arc Parish was and is a religious not-for-profit corporation and Catholic parish duly organized and existing under the laws of the State of New Jersey, with a principal place of business for the transaction of religious business at 100 Willow Bend Road, Marlton, New Jersey 08053. St. Joan of Arc Parish includes, but is not limited to, St. Joan of Arc Parish and any other organizations and/or entities operating under the same or similar name with the same or similar principal place of business.

36.     St. Joan of Arc Church was and is a religious not-for-profit corporation and Catholic church duly organized and existing under the laws of the State of New Jersey, with a principal place of business for the transaction of religious business at 100 Willow Bend Road, Marlton, New Jersey 08053. St. Joan of Arc Church includes, but is not limited to, St. Joan of Arc Church and any other organizations and/or entities operating under the same or similar name with the same or similar principal place of business.

37.     St. Joan of Arc School was and is a religious not-for-profit corporation and Catholic church parochial school organized and existing under the laws of the State of New Jersey, with a principal place of business for the transaction of religious business at 101 Evans Road, Marlton, New Jersey 08053. St. Joan of Arc School includes, but is not limited to, St. Joan of Arc School and any other organizations and/or entities operating under the same or similar name with the same or similar principal place of business.

38.     St. Joseph's Parish was and is a religious not-for-profit corporation and Catholic parish organized and existing under the laws of the State of New Jersey, with a principal place of business for the transaction of religious business at 41 Manning Avenue, North Plainfield, New

Jersey 07060. St. Joseph's Parish includes, but is not limited to, St. Joseph's Parish and any other organizations and/or entities operating under the same or similar name with the same or similar principal place of business.

39.    St. Joseph's Church was and is a religious not-for-profit corporation and Catholic church organized and existing under the laws of the State of New Jersey, with a principal place of business for the transaction of religious business at 41 Manning Avenue, North Plainfield, New Jersey 07060. St. Joseph's Church includes, but is not limited to, St. Joseph's Church and any other organizations and/or entities operating under the same or similar name with the same or similar principal place of business.

40.    St. Joseph's Elementary School was and is a religious not-for-profit corporation and Catholic parochial school organized and existing under the laws of the State of New Jersey, with a principal place of business for the transaction of religious business at 41 Manning Avenue, North Plainfield, New Jersey 07060. St. Joseph's Elementary School includes, but is not limited to, St. Joseph's Elementary School and any other organizations and/or entities operating under the same or similar name with the same or similar principal place of business.

41.    St. Joseph Roman Catholic Church was and is a religious not-for-profit corporation and Catholic church duly organized and existing under the laws of the State of New Jersey, with a principal place of business for the transaction of religious business at 685 Hooper Avenue, Toms River, New Jersey 08753. St. Joseph Roman Catholic Church includes, but is not limited to, St. Joseph Roman Catholic Church and any other organizations and/or entities operating under the same or similar name with the same or similar principal place of business.

42.    St. Joseph Grade School was and is a religious not-for-profit corporation and Catholic parochial school duly organized and existing under the laws of the State of New Jersey,

with a principal place of business for the transaction of religious business at 711 Hooper Avenue, Toms River, New Jersey 08753.  St. Joseph Grade School includes, but is not limited to, St. Joseph Grade School and any other organizations and/or entities operating under the same or similar name with the same or similar principal place of business.

43.    St. Katharine Drexel Parish was and is a religious not-for-profit corporation and Catholic parish duly organized and existing under the laws of the State of New Jersey, with a principal place of business for the transaction of religious business at 223 East Union Street, Burlington, TWP, New Jersey 08016.  St. Katharine Drexel Parish includes, but is not limited to, St. Katharine Drexel Parish and any other organizations and/or entities operating under the same or similar name with the same or similar principal place of business.

44.    St. Mary a/k/a St. Mary's was and is a religious not-for-profit corporation and Catholic organization duly organized and existing under the laws of the State of New Jersey, with a principal place of business for the transaction of religious business at 104 Center Street, Perth Amboy, New Jersey 08861.  St. Mary a/k/a St. Mary's includes, but is not limited to, St. Mary a/k/a St. Mary's and any other organizations and/or entities operating under the same or similar name with the same or similar principal place of business.

45.    St. Mary was and is a religious not-for-profit corporation and Catholic organization duly organized and existing under the laws of the State of New Jersey, with a principal place of business for the transaction of religious business at 256 Augusta St., South Amboy, New Jersey 08879.  St. Mary includes, but is not limited to, St. Mary and any other organizations and/or entities operating under the same or similar name with the same or similar principal place of business.

46.    St. Raphael – Holy Angels Parish was and is a religious not-for-profit corporation and Catholic parish duly organized and existing under the laws of the State of New Jersey, with a

13

principal place of business for the transaction of religious business at 3500 Broad Street, Trenton, New Jersey 08610. St. Raphael – Holy Angels Parish includes, but is not limited to, St. Raphael – Holy Angels Parish and any other organizations and/or entities operating under the same or similar name with the same or similar principal place of business.

47.     St. Rose Parish was and is a religious not-for-profit corporation and Catholic parish duly organized and existing under the laws of the State of New Jersey, with a principal place of business for the transaction of religious business at 603 Seventh Avenue, Belmar, New Jersey 07719. St. Rose Parish includes, but is not limited to, St. Rose Parish and any other organizations and/or entities operating under the same or similar name with the same or similar principal place of business.

48.     St. Rose Church was and is a religious not-for-profit corporation and Catholic church duly organized and existing under the laws of the State of New Jersey, with a principal place of business for the transaction of religious business at 603 Seventh Avenue, Belmar, New Jersey 07719. St. Rose Church includes, but is not limited to, St. Rose Church and any other organizations and/or entities operating under the same or similar name with the same or similar principal place of business.

49.     St. Rose High School was and is a religious not-for-profit corporation and Catholic parochial school duly organized and existing under the laws of the State of New Jersey, with a principal place of business for the transaction of religious business at 603 Seventh Avenue, Belmar, New Jersey 07719. St. Rose High School includes, but is not limited to, St. Rose High School and any other organizations and/or entities operating under the same or similar name with the same or similar principal place of business.

50.     St. Thomas' the Apostle a/k/a St. Thomas the Apostle was and is a religious not-for-profit corporation and Catholic organization duly organized and existing under the laws of the State of New Jersey, with a principal place of business for the transaction of religious business at 1 St. Thomas Plaza, Old Bridge, New Jersey 00857.  St. Thomas' the Apostle a/k/a St. Thomas the Apostle includes, but is not limited to, St. Thomas' the Apostle a/k/a St. Thomas the Apostle and any other organizations and/or entities operating under the same or similar name with the same or similar principal place of business.

51.     St. Mary of the Lake Roman Catholic Church was and is a religious not-for-profit corporation and Catholic parish duly organized and existing under the laws of the State of New Jersey, with a principal place of business for the transaction of religious business at 43 Madison Avenue, Lakewood, New Jersey 08701.  St. Mary of the Lake Roman Catholic Church includes, but is not limited to, St. Mary of the Lake Roman Catholic Church and any other organizations and/or entities operating under the same or similar name with the same or similar principal place of business.

**JURISDICTION AND VENUE**

52.     This Court has original jurisdiction over the subject matter of this dispute pursuant to 28 U.S.C. § 1332(a)(2) because this is an action between the citizens of a State and citizens of a foreign state, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

53.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because all defendants reside in the District of New Jersey.

54.     The requested relief is proper under 28 U.S.C. §§ 2201-2202 (Declaratory Judgment Act) because there now exists an actual, justiciable controversy between Century and the Diocese.

15

**FACTUAL ALLEGATIONS**

***The Insurance Policies***

55.     Although the Diocese has not provided Century with copies of its policies, Century has concluded that between 1957 and 1971, Century issued seven general liability insurance policies to the Diocese (collectively, the "Insurance Policies"), with the following terms:

a.     Policy No. 9LB23717 provided coverage for January 1, 1957 through January 1, 1960, with limits of $100,000 per person and $500,000 per occurrence.

b.     Policy No. 9LB32732 provided coverage for January 1, 1960 through January 1, 1963, with limits of $100,000 per person and $500,000 per occurrence.

c.     Policy No. 9LB43401 provided coverage for January 1, 1963 through January 1, 1966, with limits of $100,000 per person and $500,000 per occurrence.

d.     Policy No. 9LB43622 provided coverage for January 1, 1966 through January 1, 1969, with limits of $100,000 per person and $500,000 per occurrence.

e.     Policy No. ALB50036 provided coverage for January 1, 1969 through January 1, 1970, with limits of $100,000 per person and $500,000 per occurrence.

f.     Policy No. ALB50048 provided coverage for January 1, 1970 through January 1, 1971, with limits of $100,000 per person and $500,000 per occurrence.

g.     Policy No. ALB50081 provided coverage for January 1, 1971 through January 1, 1972, with limits of $100,000 per person and $500,000 per occurrence.

56.     The Insurance Policies cover losses arising out of "accidents" or "occurrences" that happen in the course of the insureds' operations.  These are known in the insurance industry as "occurrence" policies, and—like all occurrence policies—cover only liabilities caused by an "accident" or "occurrence" and do *not* cover liabilities for injuries that the insured expected or intended.

16

57.     The policies issued from 1957 to 1969 contain express limits for each "accident" or "occurrence," and each policy refers in multiple provisions to the accident or occurrence giving rise to a claim for coverage.  For example, the policies require that "[w]ritten notice of each occurrence or accident shall be given by or on behalf of the insured to the company or any of its authorized agents as soon as practicable after notice thereof has been received by an insured" and that "[s]uch notice shall contain particulars sufficient to identify the insured and also reasonably obtainable information respecting the time, place, and circumstances of the accident, the name and address of the injured, and of any available witnesses."  The policies also provide that the "insured shall co-operate with the company" in connection with any claim or suit.

58.     The policies issued in 1970 and 1971 cover "all sums which the Insured shall become legally obligated to pay as damages because of bodily injury to which this insurance applies, caused by an occurrence" and define an "occurrence" as "an injurious exposure to conditions, which results, during the policy period, in bodily injury *neither expected nor intended from the standpoint of the Insured*" (emphasis added).  They require that "[i]n the event of an occurrence, written notice containing particulars sufficient to identify the Insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and available witnesses, shall be given by or for the Insured to Century or any of its authorized agents as soon as practicable."  The policies also require the Insured to "cooperate with Century" in connection with any occurrence, claim, or suit.

### *Child Sex Abuse in the Catholic Church*

59.     Century investigates each claim for coverage under its policies independently, based on the unique set of information available to Century in connection with each claim.  Based on the information currently available, Century has been unable to make a conclusive

determination of coverage as to any of the Underlying Claims for which defendants seek indemnity.

60.    CVA complaints filed in the Underlying Claims allege intentional conduct and suggest that the Diocese had broad institutional knowledge of the sexual abuse problem.  This is consistent with allegations in similar lawsuits filed throughout the United States against other entities affiliated with the Catholic Church.  This pattern of allegations lends credence to the allegations specific to Trenton.  Nevertheless, Century has not concluded that the allegations in specific Underlying Claims are valid or that any of the claims are meritorious, and Century is defending the Diocese in those actions.  Century continues to investigate each claim, including allegations that the Diocese expected or intended the alleged abuse.

61.    Although defendants have provided some information to Century about certain Underlying Claims, that information is incomplete and insufficient.  Consequently, Century will seek discovery in this action of information relevant to each claim that defendants have submitted.  To the extent that specific information obtained in discovery does not support coverage as to a particular claim, Century will ultimately seek coverage declarations based on that information, as to that claim.

62.    Aside from the limited information provided by the Diocese, Century has also obtained information about alleged sexual abuse within the Catholic Church, and within the Diocese specifically, from publicly available sources.  This information is relevant in determining whether the Insurance Policies cover the Underlying Claims.

63.    For example, in 2012, Bruce Novozinsky wrote a memoir about sexual abuse in the Diocese of Trenton entitled *Purple Reign: Sexual Abuse and Abuse of Power in the Diocese of Trenton, New Jersey*.  In that book Novozinsky alleged that, from his vantagepoint in Trenton, he

witnessed "an insidious culture of predatory child abuse," in which people positions of authority acted "to protect abusers and silence and intimidate victims and their families." He also wrote that "details of the abuse were held under lock and key in "secret files" hidden from public view."

64.     Novozinsky specifically claimed that "[t]he Diocese [of Trenton] and its hierarchy have covered up and protected child predators in the name of self-preservation over the course of the past 50 years. The powerful bishops split the Diocese and hid the scandal through transfers and retirement packages." Novozinsky described the Diocese's conduct as "a calculated effort to suppress the voices of accusations against the clergy."

65.     In June 2019, the *Bergen Record* published an article about the secret files described in Mr. Novozinsky's book. As reported by the *Bergen Record*, "The Catholic Church's Code of Canon Law requires every diocese to maintain a secret archive—a locked safe for storage of the 'most carefully guarded' documents. Only the bishop is to have the key." The article also reported that "[t]hese [secret] archives are believed to contain priest personnel files, including potentially incriminating information about allegations of abuse and the participation of supervisors in coverups." According to the Bergen Record, "advocates [for New Jersey sexual abuse victims] complain that nobody outside of the church has been able to see those records."

66.     Other publicly available information appears consistent with the claims of Mr. Novozinsky and the *Bergen Record*. For example, according to documents available on the Vatican website, and referenced in a large number of publicly available books, articles, and CVA complaints, in 1922, the Vatican issued secret legislation known as the *Crimen Sollicitationis* that provided rules of procedure for certain types of Church proceedings, including proceedings concerning sexual abuse by clergy. The front page of the *Crimen Sollicitationis* said, "To be kept in the secret archive of the Curia for internal use. Not to be published or augmented with commentaries." (The "curia" refers to the central office of a diocese.) Pope John XXIII reportedly approved the secret

19

republication of the *Crimen Sollicitationis* in 1962, with minimal revisions.

67.    Under Title V of the *Crimen Sollicitationis*, Church law imposed absolute secrecy concerning claims made to Church officials regarding clerical sex abuse and mandated the regular destruction of documents concerning such claims.

68.    The public did not learn about the *Crimen Sollicitationis* until around 2001.

69.    As a matter of Church "law" and practice, the officers, executives, and priests in the Trenton diocese were obliged to follow the dictates of the *Crimen Sollicitationis* and other pronouncements and edicts issued by the Pope and the Vatican.

70.    Even outside the *Crimen Sollicitationis*, publicly available information suggests that the Church has historically promoted a culture of secrecy intended to protect the Church from scandal.  For example, authors Thomas P. Doyle, A. W.R. Sipe, and Patrick J. Wall write in *Sex, Priests, and Secret Codes: The Catholic Church's 2,000-Year Paper Trial of Sexual Abuse* that all cardinals in the Catholic church (the group of bishops who elect the Pope) must take an oath never to divulge information confided to them that "might bring harm or dishonor to the Holy Church."

71.    As recently as May 2002, a judge of the Holy Roman Rota, the highest court in the Church, wrote a Vatican-approved article stating that bishops should not report sexual violations of priests to civil authorities.

72.    Plaintiffs have alleged in Underlying Claims that the Church's policy of secrecy fostered an environment in which sexual predation by clergy (and other Church representatives) was implicitly condoned and actively covered up by Church officials.[2]

73.    At no time prior to the issuance of any of the Insurance Policies did anyone acting

---

[2]    *See, e.g.*, *R.N. v. Roman Catholic Diocese of Trenton* (MER-L-002510-21), complaint ¶¶ 39-51; *Palmieri v. Roman Catholic Archdiocese of Newark* (MER-L-002514-21), complaint ¶¶ 17-26.

on behalf of the Diocese advise Century about the then-existing and known problem of sexual molestation by people in positions of power and authority within the Catholic Church.  Indeed, to this day, the Diocese has never provided Century with a full accounting of the problem and the extent of sexual abuse committed by Diocese employees and agents.

74.     In the 1980s, the extent of sexual abuse of minors by Catholic clergy started to gain public attention in the United States.  Over decades, awareness of the problem grew as new allegations emerged.

75.     In 2002, *The Boston Globe* published an explosive article titled "Spotlight Investigation: Abuse in the Catholic Church."  The article thrust the issue of clerical sex abuse into the national spotlight and spawned investigations of clergy sex abuse in other dioceses throughout the country.

76.     In June 2002, the U.S. Conference of Catholic Bishops, through a National Review Board, commissioned a study from the John Jay College of Criminal Justice regarding allegations of sexual abuse in Catholic dioceses in the United States.  The study resulted in a report published in 2004 called the *The Nature and Scope of the Problem of Sexual Abuse of Minors by Catholic Priests and Deacons in the United States*.  The report concluded that, during the period from 1950 to 2002, a total of 10,667 individuals had made allegations of child sexual abuse.  Of these, the dioceses had been able to identify 6,700 unique accusations against 4,392 clergy, which is about 4% of all 109,694 ordained clergy in the United States during the relevant years.  Subsequently, additional data has emerged demonstrating that the John Jay report significantly underestimated the number of clergy involved in the sexual abuse of minors.

77.     As recently as June 2, 2023, the New York Times published an article describing long-running sexual abuse in the Catholic Church and senior officials' failure to respond

appropriately.  The article reported on the fact that the results of some 20 investigations into the Catholic Church by state attorneys general have been rolling out recently.

78.      As to Trenton, the Diocese publishes a list on its website of "clergy of the Diocese of Trenton who have been credibly accused of the sexual abuse of a minor."  The list, which was last updated on December 11, 2023, contains 31 names.  In a letter about the list of credibly accused clergy, the Bishop David M. O'Connell, Bishop of Trenton, acknowledges "the awful wounds that victims have endured at the hands of some clergy."

79.      In response to the Church's sexual-abuse epidemic, among other things, many jurisdictions enacted legislation changing the statute of limitations for claims of sexual abuse and reviving the statute of limitations for previously time-barred claims.

### *The Underlying Claims of Sexual Abuse in the Diocese of Trenton*

80.      New Jersey's Child Victims Act became law on December 1, 2019.  The CVA allows survivors of child sexual abuse to bring civil lawsuits arising out of their abuse until their 55th birthday.  The CVA also opened a two-year "revival window" during which all survivors (regardless of age) were permitted to file civil lawsuits.

81.      About 550 alleged victims have asserted sexual abuse claims against the Diocese, and the Diocese has been named as a defendant in more than 200 lawsuits under the CVA alleging bodily injury.  CVA claims against the Diocese allege sexual molestation by Diocese clergy, agents, and employees from the 1940s through the 2000s.

82.      The Diocese seeks coverage from Century for certain CVA claims under the Insurance Policies.

83.      Based on the specific allegations of each case, Century has agreed to defend the Diocese and certain parishes and schools in 87 CVA-related lawsuits, involving 212 claimants, subject to a full reservation of rights.

84. Among other things, Century reserved the right to deny coverage for any claim arising out of an injury that was not caused by an accident or occurrence or that was expected or intended.

85. As to the Underlying Claims that are potentially covered by the Insurance Policies, Century supports the Diocese's right to vigorously defend itself in connection with those claims, and Century understands that the Diocese has raised, or may raise, meritorious defenses to those claims based on the Diocese's positions as to both the facts and the law. Except in those cases in which the Diocese itself has acknowledged liability, Century does not concede, and has not concluded, that the Diocese is liable for any of the conduct alleged in any particular Underlying Claim.

86. Nevertheless, the Underlying Claims generally assert that the Diocese and/or its parishes and schools knew about or expected the sexual abuse of minors, failed to stop it, covered it up, and then lied about it. For example:

   a. The plaintiff in *Canavan v. Roman Catholic Diocese of Trenton* (MER-L-000471-21) alleges that he and a friend were molested in 1956 and that the Diocese "had/has access to and knowledge of information regarding the sexual misconduct of priests, including knowledge of the widespread pedophilia and/or sexually abusive conduct of priests within the Diocese, including defendant, Father Gerald Griffin."

   b. The plaintiff in *Thornsen v. Roman Catholic Diocese of Trenton* (BUR-L-000784-20) alleges that he was molested in around 1969 and that the Diocese "concealed the sexual abuse of plaintiff, and other minors by [his perpetrator] Father Kenneth Ghastin, in order to prevent others from discovering defendants' bad acts and negligence."

   c. The plaintiff in *Henry v. Roman Catholic Diocese of Trenton* (MER-L-000470-21) alleges that he was molested in 1971, that his abuser "was a serial molester and sexual abuser of children," and that the Diocese "knew or should have known that [the perpetrator] Father Griffin, sexually abused children and/or was not fit to serve as a priest, clergy, employee, agent, servant, representative and/or ostensible agent."

d. The plaintiff in *John SH Doe v. Diocese of Trenton* (MID-L-001877-21) alleges that he was molested regularly beginning at the age of ten and that "the Diocese knew or had reason to know that [the perpetrator] Father Douglas Hermansen was a molester and sexual abuser of children."

e. The plaintiff in *Mary Doe v. Archdiocese of Newark* (BER-L-006483-20) alleges that abuse occurred with the knowledge and acquiescence of other clergy and persons employed by the Diocese who had actual and direct knowledge of the abuse while it was occurring and/or observed interactions between the perpetrator and victim that constituted constructive notice of the abuse.

f. The plaintiff in *Michele Ann Hayes v. Diocese of Trenton* (MER-L-002470-21) alleges that the Diocese "made representations regarding safety directly to [victim's] family," and the Diocese knew or should have known about the alleged abuse.

87. Although the Underlying Claims allege different legal theories, including intentional torts, strict liability, and negligence, many of the Underlying Claims specifically allege that the Diocese, and/or its parishes or schools, committed intentional conduct by hiring or not supervising clergy about whom they had notice regarding abuse of the plaintiff or other victims.[3]

88. In addition, many of the Underlying Claims specifically allege that the victim reported his or her abuse to clergy, agents, or employees of the Diocese other than the perpetrator. For example:

a. The plaintiff in *Canavan v. Catholic Diocese of Trenton* (MER-L-000471-21) alleges that the "abuse was reported to Father Joseph Sullivan, the Head Priest at Holy Cross Parish in 1956, by Mr. Thomas Dowd, [another victim's] biological father" and that "Father Griffin [the perpetrator] was transferred from Holy Cross to another church."

b. The plaintiff in *R.N. v. Roman Catholic Diocese of Trenton* (MER-L-002510-21) alleges that he was molested beginning in 1971 and that he "told Sister Regina, Plaintiff's third grade teacher that he was being inappropriately touched by [his perpetrator] Monsignor Toomey; Sister Regina assured Plaintiff that she 'would get to the bottom of this,'" but she never broached the topic again, and the sexual abuse by Monsignor Toomey

---

[3] By way of example only, this allegation is made in the following Underlying Claims: *Charles Killcullen v. Roman Catholic Diocese of Trenton* (MER-L-002325-19); *Spotlight F.C. Doe v. Roman Catholic Diocese of Trenton* (MER-L-002289-21).

continued.

    c.    The plaintiff in *J.V. v. Roman Catholic Diocese of Trenton* (MER-L-000568-20) alleges that the Diocese was aware of a Father Banko's abuse at St. Mary's Academy in in Lakewood New Jersey and participated in covering up the heinous acts by moving errant priests and clergy members from assignment to assignment.

    d.    The plaintiff in *Doe v. Diocese of Trenton* (MER-L-002405-21) alleges that the Diocese concealed the sexual abuse of plaintiff and other children by Father Ron Becker, Father Emberdino, Father John, and other priests, to prevent parishioners and the public from discovering defendants' bad acts and negligence.

    e.    The plaintiff in *Jane Doe SZ v. Diocese of Trenton* (MER-L-002391-21) alleges that that abuse by a Father Carney was reported to other members of the clergy and ultimately ignored.

89.    Similarly, many Underlying Claims allege that the Bishop of the Diocese knew that clergy were grooming and sexually molesting children.[4]

90.    The Diocese did not provide notice of any of the alleged abuse giving rise to the Underlying Claims to Century at any time before the enactment of the CVA in 2019.

91.    Aside from allegations in court filings, counsel for CVA claimants have repeatedly made public statements indicating that the Diocese knew about and covered up acts of sexual abuse. For example, the *Trentonian* published an article in June 2020 titled *Numerous victims of childhood sex abuse file lawsuits against Diocese of Trenton*. The article quoted attorney John W. Baldante as saying that sex abuse is "an epidemic in the Catholic Church, and it has been going on for centuries." Mr. Baldante was also quoted as saying, "The Catholic Church has known for centuries their priests were sexually abusing children and did absolutely nothing to change the situation and protect those children." As to the Diocese in particular, the *Trentonian* reported that

---

[4]    *See, e.g., William Ryan v. Roman Catholic Diocese of Trenton* (MER-L-000183-21); *J.V. v. The Diocese of Trenton* (MER-L-000568-20); *Lorenzo D'Oria v. Diocese of Trenton* (MER-L-000318); *R.S. v. Roman Catholic Diocese of Trenton* (MER-L-002107-21); *Doe v. Diocese of Trenton* (MID-L-001877-21); *Hernandez v. Roman Catholic Diocese of Trenton* (MID-L-006729-21) ("Diocese" is one of several named parties in each action).

"the Diocese of Trenton was made aware of allegations against [a particular perpetrator] decades before any of his victims made their accusations public."

92.     Similarly, Patch.com published an article in January 2021 titled *Rumson Priest Named in Sex Abuse Lawsuit Against Trenton Diocese*.  The article quotes attorney Greg Gianforcaro as saying, "These survivors were betrayed by the Diocese of Trenton when they were left vulnerable to abuse, harm and immeasurable trauma."

93.     The facts described above raise substantial questions as to whether, based on the facts and circumstances of any particular claim, the Diocese would be entitled to coverage under the Insurance Policies.  Given these facts, Century needs discovery about the Underlying Claims to evaluate the Diocese's requests for coverage and to make a final determination as to whether the Diocese is entitled to coverage under the Insurance Policies for any particular Underlying Claim.

### *Requests for Information*

94.     Century currently lacks information needed to evaluate the claims for which the Diocese seeks coverage under the Insurance Policies.

95.     In connection with 213 CVA actions that have been consolidated for discovery, the Superior Court of Mercer County, Law Division, recently ordered the Diocese to produce documents "concerning the Diocese of Trenton's knowledge of sexual abuse and/or [the Diocese's] patterns and practices in response to such knowledge as to its archbishops, bishops, pastors, clergy, employees, religious order priests, brothers, monsignors, teachers, nuns, and/or agents (hereinafter referred to collectively as 'alleged perpetrator(s)') against whom there have been allegations, claims, and/or reports of sexual abuse, sexual misconduct, and/or sexually

inappropriate behavior by alleged perpetrators."[5]   The Court's order requires the Diocese to produce materials about the Diocese's knowledge of clergy sexual abuse, dating back as far as 1934, including:

    a.   personnel files/records;

    b.   assignment histories;

    c.   evaluations;

    d.   lawsuits;

    e.   settlements;

    f.   diocese Independent Victims' Compensation Program claims;

    g.   information relied on in placing clergy or agents on the "Credibly Accused" list;

    h.   "secret archive files";

    i.   information and documents about alleged perpetrators provided to any grand jury;

    j.   reports to the Archbishop/Bishop, pastor(s), and/or supervising clergy responsible for supervising alleged perpetrators;

    k.   documents, minutes, and reports of any group charged with investigating sexual abuse;

    l.   documents about the duties of alleged perpetrators.

96.     Century has also requested general information from the Diocese about the history of sexual abuse within the Diocese, including information about the Diocese's policies and practices concerning the handling of allegations of sexual abuse by clergy, the Diocese's knowledge of the scope and pervasiveness of sexual abuse by clergy within the Diocese, whether the Diocese expected acts of sexual abuse, and other issues relevant to the Diocese's requests for

---

[5]     *In re: Roman Catholic Diocese of Trenton Sexual Abuse Litigation* (MER-L-002278-19), November 6, 2023 Order.

coverage in general and with respect to particular Underlying Claims.

97.    To date, the Diocese has not provided the requested information to Century, and Century has no access to the Diocese's internal files.  To the extent that documents have been produced to the underlying plaintiffs pursuant to the Superior Court's November 6, 2023 order, those documents have not been made available to Century.

98.    Also, the Diocese has failed to timely provide other information regarding underlying CVA lawsuits to Century, including but not limited to pleadings, court orders, discovery materials, and defense counsel reports, which are materials customarily provided as a matter of course to an insurer in connection with underlying litigation for which the insurer has agreed to defend under a reservation of rights and which materials have been requested by Century.

99.    Without all of the requested information described above, Century cannot reach a final determination as to the Diocese's coverage claims.  Century thus brings this declaratory judgment action to obtain discovery from the Diocese concerning facts bearing on coverage for the Underlying Claims and to seek an adjudication of any legal issues raised by the facts as to any particular claim.

## FIRST CLAIM FOR RELIEF
### (DECLARATORY JUDGMENT:  DUTY TO INDEMNIFY UNDERLYING CLAIMS)

100.    Plaintiff incorporates, restates, and re-alleges the preceding paragraphs.

101.    Century issued the Insurance Policies listed above in paragraph 55 to the Diocese.

102.    Each of the Insurance Policies only covers bodily injury to a third party, caused by an accident or occurrence, that occurred during the policy's stated "policy period."

103.    Century seeks a declaration that it has no obligation to indemnify the Diocese and/or any individual parishes or schools for any Underlying Claims that the Diocese and/or any individual parishes or schools have tendered or may tender, including without limitation:

28

a.    to the extent that the bodily injuries alleged in the Underlying Claims were either expected or intended from the standpoint of the insured;

b.    to the extent that the Underlying Claims do not involve an accident or occurrence within the meaning of the Insurance Policies;

c.    to the extent that the Underlying Claims resulted from the insured's failure to mitigate;

d.    to the extent that the Underlying Claims resulted from the insured's failure to promptly take all reasonable steps to prevent other bodily injury arising out of the same or similar conditions that gave rise to the initial accident, occurrence, claim, or suit;

e.    to the extent that the insured failed to cooperate with the insurer as required under the Insurance Policies;

f.    to the extent that the insured failed to provide timely notice of an accident, occurrence, claim, or suit, as required under the Insurance Policies;

g.    to the extent that the Underlying Claims do not involve bodily injury during the relevant policy periods;

h.    to the extent that the Underlying Claims involve a known loss or a loss-in-progress;

i.    to the extent that the remaining terms of the Insurance Policies bar coverage for the Underlying Claims; and/or

j.    to the extent that the Diocese as well as its affiliated parishes and schools are not insureds under the Insurance Policies.

104.    Century also seeks a declaration that it has no obligation to indemnify the Diocese and/or any individual parishes or schools for any Underlying Claims in which the bodily injury at issue occurred outside of the Insurance Policies' stated policy periods.

105.    As to Underlying Claims in which the sexual abuse at issue occurred both during and outside of the Insurance Policies stated policy periods, Century seeks a declaration that it is has no obligation to indemnify the Diocese and/or any individual parishes or schools for any damages associated with bodily injury that occurred outside of the Insurance Policies stated policy periods, and that Century is obligated—if at all—to indemnify the Diocese and/or any individual

parishes or schools only for that portion of bodily injury that occurred during the Insurance Policies stated policy periods.

106.    As to Underlying Claims, if any, for which Century is obligated to indemnify the Diocese and/or any individual parishes or schools, Century also seeks a declaration as to the number of "occurrences," for insurance-coverage purposes, associated with such claims.

**PRAYER FOR RELIEF**

**WHEREFORE**, plaintiffs respectfully request that the Court enter judgment against the Diocese:

a.    declaring that Century has no obligation to indemnify the Diocese and/or any individual parishes or schools for any Underlying Claims to the extent that a claim is not covered accident and/or the Diocese failed to comply with the terms of the relevant policies;

b.    declaring that Century has no obligation to indemnify the Diocese and/or any individual parishes or schools for any Underlying Claims in which the bodily injury at issue occurred outside of the Insurance Policies' stated policy periods;

c.    declaring that, where relevant, Century is obligated, if at all, to indemnify the Diocese and/or any individual parishes or schools only for that portion of bodily injury that occurred during the Insurance Policies' stated policy periods;

d.    as to Underlying Claims, if any, for which Century is obligated to indemnify the Diocese and/or any individual parishes or schools, declaring the number of "occurrences," for insurance-coverage purposes, associated with such claims; and

30

e.      granting any other relief that the Court deems just and proper.

Dated: February 5, 2024

**CLYDE & CO US LLP**

By: s/ Daren McNally
Daren McNally
Marianne May
340 Mt. Kemble Avenue, Suite 300
Morristown, New Jersey 07960
T (973) 210-6700
F (972) 210-6701
Daren.mcnally@clydeco.us
Marianne.may@clydeco.us

**O'MELVENY & MYERS LLP**
Richard B. Goetz (*pro hac* pending)
400 South Hope Street
Los Angeles, CA 90071
213-430-6000
rgoetz@omm.com

**BAUGHMAN KROUP BOSSE PLLC**
John F. Baughman (*pro hac* pending)
Nathaniel E. Marmon (admission pending)
One Liberty Plaza – 46th Floor
1 Liberty Street
New York, NY 10006
(212) 548-3212
jbaughman@bkbfirm.com
nmarmon@bkbfirm.com

*Attorneys for Plaintiff*
*Century Indemnity Company*

31